# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**DEBRA J. MORTON**                    **NO. 4:10-CV-596**

**v.**                                          **JUDGE JONES**

**STRYKER MEDICAL, a division of**      **MAGISTRATE JUDGE METHVIN**
**STRYKER CORPORATION**

### REPORT AND RECOMMENDATION
### ON MOTION FOR SUMMARY JUDGMENT
### (Doc. 41)

Debra J. Morton filed this action against her former employer, Stryker

Medical, on March 17, 2010 (Doc. 1). An amended complaint, filed on July 29,

2010 (Doc. 19), alleges that Morton was wrongfully terminated and constructively

discharged, in violation of public policy.[1] This court has jurisdiction pursuant to

28 U.S.C. §§ 1331. Before the court is Stryker's motion for summary judgment.[2]

The motion has been referred to the undersigned for a report and recommendation,

and is now ripe for disposition.[3]

---

[1] Pursuant to a stipulation entered by the parties on September 20, 2011 and approved by
the court on September 21, 2011, Count II of the amended complaint, which alleged that
Stryker violated the Whistleblower Act, 43 P.S. §§ 1421–1428, was dismissed (Docs. 39,
40).

[2] Stryker filed the motion for summary judgment on November 1, 2011 (Doc. 41), along
with a statement of material facts and a supporting brief (Docs. 42, 43). Morton filed an
answer to the statement of facts and a brief in opposition to the motion on December 6,
2011 (Docs. 47, 61), as well as several exhibits (Docs. 48–60). Stryker filed a reply brief,
a statement of facts and an appendix on December 20, 2011 (Docs. 62, 63, 64).

[3] On November 2, 2011, Judge Jones referred the pending motion to summary judgment
to undersigned. (Doc. 44).

2

**FINDINGS AND RECOMMENDATIONS**

## I. Background

For purposes of this analysis, Morton's factual averments will be accepted as true and are construed in the light most favorable to her. Morton contends as follows:

Stryker Medical is a division of both Stryker Corporation and Stryker Sales Corporation. (Doc. 41-1, p. 6 (deposition p. 17:17-18); p.7 (deposition p. 18:16–19:8)). Stryker manufactures beds and cots and sells them to medical providers. (Docs. 42, 47 ¶ 2). Morton was hired by Stryker in March, 2009 as a Group Clinical Manager. (*Id*. at ¶ 3). At the time of her employment with Stryker, Morton was a registered nurse ("RN"), licensed by Pennsylvania (*Id*. at ¶ 4). Morton's job with Stryker was to develop the clinical program and manage two clinical employees—Tracey Ash and Jill Taylor—who had already been hired by Stryker as clinical specialists. (*Id*. at ¶¶ 5, 6). Morton's duties also including supporting the sales group, working with the marketing group, improving customer service experience and ensuring the sales team knew about customer service and product knowledge. (*Id*. at ¶ 9).

In 2009, Stryker entered into a contract with Huntsville Hospital ("the hospital") in Huntsville, Alabama. Part of the contract included a provision

3

whereby the hospital would purchase a large quantity of beds from Stryker and it, in turn, would provide a full-time employee to educate the hospital staff on the proper use of Stryker products, *to wit.*, beds. (*Id*. at ¶ 13). To fulfill its contractual obligations, Stryker hired Jennifer Carter as a clinical project nurse in November, 2009. (*Id*. at ¶¶ 14, 15). Stryker communicated to the hospital that the clinical project nurse position would be staffed by an RN. (*Id*. at ¶ 17). Carter's job description required the candidate to possess a Bachelor's Degree in nursing as well as 5–7 years experience as an RN. (Doc. 53, p. 20–21). Carter's job responsibilities included educating nurses and service providers of the use of Stryker beds. (Docs. 42, 47 ¶ 18). Carter reported directly to Morton. (*Id*. at ¶ 15).

During her employment, Morton was disappointed with the performance of her coworkers and testified that she felt her relationship with Stryker was not good. (Doc. 47, ¶¶ 22, 23). On January 25, 2010, Morton received a "documented counseling" memorandum from Stephanie Cloney, Stryker's Human Resources Manager and Sean Daugherty, Stryker Medical's Senior Director of Global Marketing and Sales Support. (Docs. 42, 47  ¶ 27). The memo noted the that Morton's team was experiencing difficulty in working together as well as Morton's dissatisfaction with her team. (*Id.* at ¶ 28). There had been a previous investigation involving Morton and alleged comments made by her regarding

4

coworkers. (Doc. 42, ¶ 29); (Doc. 48, p 8–9 (deposition p. 120:24–121:14)).

Although Cloney testified that Morton had interfered with Stryker's investigation

of the incident by discussing it with others, Morton was not disciplined as a result

of the investigation. (Docs. 42, 47 ¶ 29); (Doc. 48, p. 9 (deposition p.

122:1–124:4)).

On February 4, 2010, Morton received an email from one of her clinical

specialists raising a question of whether Carter had a CCRN certification. (*Id*. at ¶

32). Although Carter's position with Stryker did not require the specialized CCRN

certification, Morton forwarded the email to Cloney. (*Id*. at ¶ 33, 34). Cloney

reviewed Carter's file and discovered a problem with Carter's credentials (*Id*. at ¶

35). The Alabama State Board of Nursing reported that Carter's license had been

suspended for disciplinary reasons. (*Id*. at ¶ 36). On February 8, 2010, Cloney

directed Carter not to return to the hospital pending resolution of the licensure

issue. (*Id*. at ¶ 37). Cloney then called Morton to inform her that an inquiry had

been made into Carter's licensure and that she (Cloney) had been informed that

although Carter had previously held a license, it had been suspended in 2007 and

revoked in 2008. (*Id*. at ¶¶ 38, 39). Morton acknowledged that, on February 8,

2010, she knew that Carter had been instructed not to return to the hospital

pending the resolution of the investigation. (*Id*. at ¶ 40). Cloney and Morton

agreed that Morton would not contact the hospital until after Cloney spoke with Carter and followed-up with Morton. (*Id*. at ¶ 41).

Cloney contacted Carter, who claimed that she did, in fact, hold a valid license. Cloney then communicated this to Morton. (Doc. 56, p 3 (deposition p. 190)). However, a short time later, Cloney received an email from Carter in which she acknowledged that she did not have a valid license. (*Id*. at p 3 (deposition p 193)). After Cloney informed Morton that Carter had conceded her she did not hold a valid license, Morton contacted Karol Jones, the chief nursing officer at the hospital, and indicated that Carter may not possess valid licensure. (Docs. 42, 47 ¶ 42). Morton then called Cloney to inform her of the call to Jones. (*Id*. at ¶ 46). When Cloney asked Morton why she had told "all of that" to the hospital, Morton responded that she could not lie. (*Id*.). Morton maintains that she had a legal obligation to inform the hospital of Carter's lack of licensure. (Doc. 47, ¶ 46). Morton called Daugherty and left a message explaining her reason for calling Jones and what had been communicated. (Docs. 42, 47 ¶ 47).

On February 10, 2010, Morton sent an email to Cloney and Daugherty inquiring of a final decision on Carter's status, indicating that there was a lot of things going on at the hospital and that she needed to make the appropriate adjustments to her schedule to accommodate the changes. (*Id*. at ¶ 49). On

6

February 10, 2010, Stryker suspended Morton. (*Id*. at ¶ 50).[4] Although Stryker

maintains the suspension was based on Morton's interference with the

investigation, Morton argues that she was suspended for communicating Carter's

lack of licensure to the hospital. (*Id.*).

Morton thereafter drafted a letter on February 16, 2010, indicating her

intention to leave her employment with Stryker, although, she maintains, that it did

not reflect a final decision of her part. (*Id*. at ¶ 52). Morton sent the letter, via

email, to Brian White, with copies to Daugherty and Brad Saar, president of

Stryker's medical division, on February 17, 2010. (*Id*. at ¶ 54). In a call to Morton,

Dougherty stated that she would be terminated if her resignation was not

submitted. (*Id*. at ¶ 55; Doc. 52, p.13–14 (deposition p. 73:8–74:2)). On

February 19, 2010, Stryker sent Morton an email accepting her letter as a

resignation. (*Id*. at ¶ 56). Stryker had prepared a termination letter, but it was never

sent. (*Id*. at ¶ 58).

The present action followed. Morton maintains that she resigned in the face

of threats of termination and, thus, that her separation from employment with

Stryker constitutes constructive discharge. She seeks, *inter alia.*, compensatory

---

[4] The suspension was not communicated to Morton until February 11, 2010. (*Id*. at ¶ 51).

and punitive damages, attorneys fees, and damages for mental and emotional distress.

## II. Issues Presented

Stryker's motion for summary judgment raises the following issues:

1.  Morton has failed to establish a claim for constructive discharge inasmuch as she voluntarily resigned from her position with Stryker.

2.  Even if Morton could establish a constructive discharge claim, she is unable to demonstrate that such discharge violated public policy.

3.  Stryker had an independent, plausible, legitimate reason for discharging Morton had she not resigned.

## III. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).[5] A fact is material if its determination might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477

---

[5] The language of Rule 56 was revised by amendment effective December 1, 2010. However, "[t]he standard for granting summary judgment remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases." Fed.R.Civ.P. 56 advisory committee's note to 2010 Amendments.

8

U.S. 242, 248-49 (1986). A dispute is genuine if "a reasonable jury could return a

verdict for the nonmoving party." *Id.*

Initially, the moving party bears the burden of demonstrating the absence of

a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). The movant meets this burden by pointing to an absence of evidence

supporting an essential element as to which the non-moving party will bear the

burden of proof at trial. *Id.* at 325.

If the moving party carries this initial burden, "the nonmoving party must

come forward with specific facts showing that there is a genuine issue for trial"

and do more than "simply show that there is some metaphysical doubt as to the

material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)

(internal quotation marks omitted)). The nonmoving party cannot rely upon

unsupported allegations in the pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322–23 (1986). Further, arguments made in briefs "are not evidence and cannot by

themselves create a factual dispute sufficient to defeat a summary judgment

motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103,

1109–10 (3d Cir. 1985).

9

The Court must view the facts in a light most favorable to the non-moving party, and the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against the moving party.'" *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (quoting *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). *See also Anderson*, 477 U.S. at 242. Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the court weigh the evidence. *Josey v. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251–52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

## IV. Discussion

*(A)      Constructive Discharge*

Courts reviewing constructive discharge claims must employ an objective standard, and ask whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir.1993). Factors relevant to this issue are whether the employer (1) "threatened [the employee] with discharge" or "urge[d] or suggest[ed] that she resign or retire," (2) "demote[d] her," (3) "reduce[d] her pay or benefits," (4) "involuntarily transferred [her] to a less desirable position," (5) altered her "job responsibilities," or (6) gave "unsatisfactory job evaluations." *Id.* These factors are not an absolute requirement for recovery but rather are examples of actions that are indicative of such a de facto termination. *See Duffy v. Paper Magic Group*, 265 F.3d 163, 168 (3d Cir.2001); *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 718 n. 2 (3d Cir.1997).

In the instant matter, Stryker claims that Morton is unable to establish constructive discharge in light of her resignation, which, it contends, was voluntary. It argues further that her resignation cannot constitute constructive discharge because a reasonable person in her position would not have felt

compelled to resign. Morton asserts that she resigned because she believed she was about to be fired. In the face of such a dilemma, she maintains, her separation cannot be viewed as voluntary.

"Employee resignations . . . are presumed to be voluntary. This presumption remains intact until the employee presents evidence to establish that the resignation . . . was involuntarily procured." *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227–28 (3d Cir.1999) (internal citations omitted); *Butczynski v. Luzerne County*, No. 3:05-CV-645, 2007 WL 295420, *4 (M.D. Pa. Jan. 26, 2007). A plaintiff who voluntarily resigns may assert a claim of constructive discharge when the employer's alleged conduct creates an atmosphere that is the constructive equivalent of a discharge. *Riding v. Kaufmann's Dept. Store*, 220 F. Supp.2d 442, 463 (W.D. Pa. 2002) (citing *Gray supra* at 1079). Courts employ an "objective test to determine whether an employee can recover on a claim of constructive discharge." *Duffy,* 265 F.3d at 167. "[T]he objective standard measures whether a reasonable person in the employee's position would have felt compelled to resign-that is, whether he would have had no choice but to resign." *Dooley v. CIBA/Novartis-Morristown*, No. 3:07-CV-132, 2009 WL 179726, *14 (M.D. Pa. Jan 26, 2009) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir.1998)).

12

An employee can establish a claim for constructive discharge when "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." *Matos v. PNC Financial Services Group*, No. 03-5320, 2005 WL 2656675, *4 -5 (D.N.J. Oct. 17, 2005) (quoting *E.E.O.C. v. University of Chicago Hospitals*, 276 F.3d 326, 331-32 (7th Cir.2002)); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987) (trier of fact could reasonably find constructive discharge from a statement to employee that he would be fired at end of his probationary period); *see also, e.g., Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 168 (3d Cir.2001) (no grounds for a finding of constructive discharge because "Paper Magic never threatened to fire Duffy [or] encouraged her to resign from her position"); *Clowes supra* at 1161 (characterizing a threat of discharge as a factor "commonly cited by employees who claim to have been constructively discharged.").

A threat to fire amounts to constructive discharge where a reasonable employee in the same circumstances would have believed she would be fired and would have resigned. *Id*. ("We employ an objective test in determining whether an employee was constructively discharged from employment: whether 'the conduct complained of would have the foreseeable result that ... a reasonable person in the employee's shoes would resign.'") (quoting *Gray, supra* at 1079).

13

As noted above, there is evidence that Dougherty told Morton that if she did not resign, Stryker would terminate her. (Doc. 52, p.13–14 (deposition p. 73:8–74:2)). In addition, there is evidence that Stryker drafted a letter of termination in anticipation of Morton's potential discharge. Viewing the facts in a light most favorable to Morton as the non-movant, Morton has put forth sufficient evidence to establish that a genuine issue of material fact exists on the question of constructive discharge. Accordingly, summary judgment should be denied on this issue.

*(B)    Public Policy Implications*

Stryker next argues that, even if Morton could establish a constructive discharge claim, it does not fall into one of the narrow exceptions to Pennsylvania's at-will employment doctrine and, therefore, she has no actionable claim.

"Pennsylvania law presumes that an employee serves at the pleasure of an employer and the relationship may be terminated by either party and at any time absent a specific term or duration." *Rogers v. Int'l Bus. Machs. Corp.*, 500 F. Supp. 867, 868 (W.D. Pa.1980) (citing *Cummings v. Kelling Nut Co.*, 368 Pa. 448, 84 A.2d 323, 325 (Pa.1951)). Pennsylvania law prescribes that at-will employment may be terminated for any reason, or no reason, provided that the termination is

not contrary to public policy. *Kelly v. Ret. Pension Plan for Certain Home Office*, 73 F. App'x. 543, 544 (3d Cir.2003) (citing *Clark v. Modern Group Ltd.*, 9 F.3d 321, 327-28 (3d Cir.1993)); *see Shick v. Shirey*, 552 Pa. 590, 716 A.2d 1231 (Pa.1998); *Lekich v. Int'l Bus. Machs. Corp.*, 469 F.Supp. 485, 488 (E.D. Pa.1979) ("A discharge may be for good reason or for no reason, but not for an illegitimate reason.").

"A discharged employee may have a cause of action against his employer when the employer exercises his otherwise absolute right to terminate the employment relationship in a manner which contravenes or undermines an important public policy." *Molush v. Orkin Exterminating Co., Inc.*, 547 F.Supp. 54, 56 (E.D. Pa.1982). Pennsylvania courts have noted, however, that exceptions to the at-will employment doctrine "should be few and carefully sculpted so as to not erode an employer's inherent right to operate its business as it chooses." *Rothrock v. Rothrock Motor Sales, Inc.*, 584 Pa. 297, 883 A.2d 511, 516 (Pa.2005). The public policy exception to at-will employment will be used in only the "'most limited of circumstances, where discharges of at-will employees would threaten the clear mandates of public policy.'" *Hunger v. Grand Cent. Sanitation*, 447 Pa. Super. 575, 670 A.2d 173, 175 (Pa. Super. Ct. 1996) (quoting *Krajsa v. Keypunch, Inc.*, 424 Pa. Super. 230, 622 A.2d 355, 358 (1993)); *see Rogers*, 500

F.Supp. at 869 (W.D. Pa.1980) (limiting employer's power to terminate if related to a violation of a clear mandate of public policy). For a plaintiff's claim to fall under the public policy exception, "the employee must point to a clear public policy articulated in the constitution, in legislation, an administrative regulation, or a judicial decision." *Hunger*, 670 A.2d at 175 (citing *Jacques v. AKZO Int'l Salt, Inc.*, 422 Pa. Super. 419, 619 A.2d 748 (Pa. Super. Ct.1993)). The simple articulation of the policy, however, is not enough; the statute, constitution or judicial decision "must be applicable directly to the employee and the employee's actions." *Id.*

"[T]he Pennsylvania Supreme Court has held that in order for the public policy exception to apply, the alleged violation of public policy must be of Pennsylvania public policy, not solely an alleged violation of federal law." *Kelly*, 73 F. App'x at 545 (citing *McLaughlin v. Gastrointestinal Specialists, Inc.*, 561 Pa. 307, 750 A.2d 283 (Pa. 2000)). The clarity of the public policy is essential to the determination of whether the exception is to be applied. "'[P]ublic policy is to be ascertained by reference to the laws and legal precedents and not from supposed public interest.'" *McLaughlin*, 750 A.2d at 288 (citing *Shick*, 716 A.2d at 1237).

Public policy exceptions have been recognized in only extremely limited circumstances. A public policy exception is found in limited categories, including,

when an employee is fired for performing a function that he or she is required to perform by law, *e.g., Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 565 A.2d 1170 (Pa. Super. Ct.1989) (employee fired for reporting a nuclear safety violation); *Reuther v. Fowler & Williams, Inc.*, 255 Pa. Super. 28, 386 A.2d 119 (Pa. Super. Ct.1978) (employer fired employee for serving on a jury), and when the discharge itself is criminal. *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d. Cir.1979) (refusal to submit to polygraph examination); *Polsky v. Radio Shack*, 666 F.2d 824 (3d Cir.1981) (results of a polygraph examination required as a condition of continued employment). "An essential element in permitting a cause of action for wrongful discharge is a finding of a violation of a clearly defined mandate of public policy which 'strikes at the heart of a citizen's social right, duties and responsibilities.'" *Yetter v. Ward Trucking Corp.*, 401 Pa. Super. 467, 585 A.2d 1022, 1026 (Pa. Super. Ct 1991) (citing *Hineline v. Stroudsburg Elec. Supply Co., Inc.*, 384 Pa. Super. 537, 559 A.2d 566 (Pa. Super. Ct. 1989)); *see Burkholder v. Hutchison*, 403 Pa. Super. 498, 589 A.2d 721, 724 (Pa. Super. Ct.1991).

Morton submits that she was obligated to report Carter's lack of licensure under her ethical duties and oath as an RN. Stryker contends, however, that Morton had no such statutory obligation to report the issue to the hospital and,

further, that patient safety was not threatened because, it maintains, Carter had was

not in direct contact with, and did not provide care to, any of the hospital's

patients. Moreover, inasmuch as Carter had already been suspended at the time

Morton reported the matter to the hospital, there was no imminent threat of patient

safety being jeopardized.

In support of her argument that she was obligated to report Carter, Morton

references the Board of Nursing Code, found in the Pennsylvania Administrative

Code, which provides:

> (b) A registered nurse may not:
>
>> (3) Knowingly permit another individual to use his license or
>> temporary permit for any purpose or knowingly permit the unlicensed
>> person under the registered nurse's jurisdiction or supervision to
>> misrepresent that the individual is a licensed nurse.
>
> (c)   A registered nurse who fails to comply with an obligation or
> prohibition under this section is subject to disciplinary and corrective
> measures under section 14 of the act (63 P.S. §224).

49 Pa. Code § 21.18.

This regulation clearly states that a registered nurse, such as Morton, may

not "knowingly permit [an] unlicensed person under the registered nurse's

jurisdiction or supervision to misrepresent that the individual is a licensed nurse."

49 Pa. Code § 21.18. Failure to comply with this obligation is grounds for

18

disciplinary action. Accordingly, for purposes of summary judgment, Morton has identified a clear administrative regulation that implicates her duty and responsibility as a RN to report Carter, who was under Morton's supervision and was not licensed as she had represented.[6]

Stryker contends, however, that Morton had no duty to report this issue to the hospital, because the hospital had already suspended Carter and Carter provided no direct care to patients. Morton submits that Carter did, in fact, provide patient care. In support of this proposition, Morton points to Carter's job description as a clinical project nurse, which includes as an essential function of the position "Will have some direct, non-invasive patient care." (Doc. 53, p. 20–21).

While the job description is unclear whether the position required one to be an RN, Stryker informed the hospital that it would staff the position with an RN. (Docs. 42, 47 ¶ 17). Although Carter had been suspended at the time Morton contacted the hospital about her licensure, the Pennsylvania regulation prohibits a RN from "knowingly permit[ting] an unlicensed person . . . *to represent* that the

---

[6] As noted in the Order denying Stryker's motion to dismiss, Morton had "sufficiently pleaded that she had, in fact, a duty to report a violation of the Nursing Code." (Doc. 18, p. 9). Regardless of any factual disputes, as a legal matter, this proposition remains unchanged: Morton had an affirmative duty to report Carter.

person is a licensed nurse." Under this regulation, a reasonable jury could conclude that Morton had an obligation to notify the hospital.

Further, Morton has put forth evidence to establish the potential threat to patient safety based on Carter's lack of licensure coupled with her temporary suspension. Clearly, the hospital was unaware of the circumstances surrounding Carter's absence or its expected duration. Given Stryker's representations to the hospital that the clinical project nurse would be an RN, the hospital had an expectation to be informed if a misrepresentation had occurred. Stryker's desire to handle the matter internally would not divest it of the obligation to inform the hospital of Carter's misrepresentation. Furthermore, Stryker's inclination to delay reporting the matter has no impact on Morton's ethical obligation to properly report Carter's lack of licensure to the appropriate parties, which includes the hospital.

There is sufficient evidence to allow a fact-finder to conclude that Morton had an affirmative duty to report Carter's lack of licensure and misrepresentation as well as an obligation to guard patient safety by informing the hospital of the issue. Accordingly, for purposes of summary judgment, Morton has established her action fell within the public policy exception to Pennsylvania's at-will

20

employment doctrine. The motion for summary judgment should, therefore, be denied on this issue.[7]

*(C)    McDonnell-Douglas Analysis*

Finally, Stryker maintains that even if Morton has established a constructive discharge claim which falls within the public policy exception to the Commonwealth's at-will employment doctrine, it has offered legitimate grounds for her discharge, for which she is unable to demonstrate pretext. Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff has established a prima facie case, the burden shifts to the defendant to articulate an independent, plausible and legitimate reason which provides a basis for plaintiff's discharge. Here, Stryker argues that Morton had previously been disciplined, and that she had interfered with two investigations. Stryker asserts it therefore had cause to question Morton's leadership and managerial skills. These factors, it maintains, constituted independent, plausible and legitimate grounds to terminate her employment.

---

[7] Stryker's argument that Morton was unaware of the reason that Carter's license was suspended is of no merit. The statutory reporting duty makes no distinction as to the reason a subordinate lacks licensure and, moreover, it's duty does not extend into investigating such reasons.

21

Inasmuch as Stryker has come forward with independent, plausible and legitimate reasons for their actions, Morton must therefore establish that these reasons were pretextual. *See e.g.*, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n. 2 (3d Cir.1997) (noting that the defendant's burden at this stage is relatively light and that it is satisfied if the defendant articulates a legitimate reason for the adverse employment action). To do this, a plaintiff must offer evidence "from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious reason was more likely than not a motivating or determinative cause of the employer's action." *Showalter v. Univ. of Pittsburgh Medical Center*, 190 F.3d 231, 235 (3d Cir. 1999); *Keller v. Orix Credit*, 130 F.3d 1101, 1108 (3d. Cir. 1997). "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d. Cir. 1994) (citation omitted). The court must then determine whether the plaintiff's evidence is sufficient "to permit a reasonable fact finder to conclude that the [employer's] reasons are

22

incredible[.]" *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996).

Morton argues that Stryker's proffered reasons for discharging her are not credible in light of the sequence of events and time frame in which the termination action developed. Considering the record presented, a reasonable fact-finder could rationally conclude that Stryker's proffered reasons for termination were a mere pretext for the real reason: Morton's reporting that Carter was unlicensed.

Accordingly, for purposes of the present motion, Morton has satisfied her burned of establishing pretext. Therefore, summary judgment is not warranted.

## V. Recommendation

Based on the foregoing, it is respectfully recommended that the motion for summary judgment (Doc. 41) be denied.

Signed July 20, 2012.

_____
MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE